39 P.3d 538

Steven Duane BOTMA, a single man, and Patricia A. Himes, individually and as Guardian/Conservator of Holly Lyn Castano, an incapacitated adult, Plaintiffs–Appellants,

v.

Ronald E. HUSER and Jane Doe Huser, husband and wife, and Parrillo Weiss & O'Halloran, a professional association, Defendants–Appellees.

No. 1 CA–CV 01–0003.

Court of Appeals of Arizona, Division 1, Department B.

Feb. 5, 2002.

Review Denied June 25, 2002.

Roush, McCracken, Guerrero & Miller by Charles D. Roush, Robert D. McCracken, Peter A. Guerrero, Phoenix, Attorneys for Plaintiffs–Appellants.

Osborn Maledon, P.A. by David G. Campbell, Thomas L. Hudson, Phoenix, Attorneys for Defendants–Appellees.

## OPINION

NOYES, Judge.

¶1 The issue is whether Arizona, which prohibits assignment of a legal malpractice claim, should allow assignment of a legal malpractice claim that is packaged with assignment of a bad faith claim against an insurance carrier. The trial court held that such an assignment of a legal malpractice claim was invalid, and it dismissed the complaint. We affirm.

### I.

¶2 In reviewing the grant of a motion to dismiss, we accept as true all well-pleaded facts, and we give plaintiffs the benefit of all inferences arising therefrom. *Johnson v. McDonald*, 197 Ariz. 155, 157, ¶2, 3 P.3d 1075, 1077 (App.1999). The facts are summarized as follows: In September 1994, Steven Duane Botma negligently caused an auto accident in which Holly Lyn Castano, the daughter of Patricia A. Himes, suffered catastrophic injuries. Botma was driving a car that was covered by an insurance policy issued by Safeway Insurance Company ("Safeway") that had liability limits of $15,000 per person. The claims of Himes' daughter greatly exceeded the Safeway policy limits; her special damages exceeded $6,000,000.

¶3 In 1995, Himes offered to settle all claims against Botma for the $15,000 policy limits. Safeway contends that it accepted the offer in early 1996 and that Himes' attorneys drafted a settlement agreement/release and advised that Himes would sign the release. In June 1996, however, Himes withdrew the offer and filed suit against Botma (and also against the manufacturer and seller of the car in which Himes' daughter was

injured). To represent Botma, Safeway hired Ronald E. Huser, local counsel for a Chicago law firm, Parrillo, Weiss & O'Halloran. Himes alleges, on information and belief, that the attorneys in this law firm have an ownership interest in Safeway and represent all Safeway insureds who are sued.

¶ 4 In a letter to Huser dated April 3, 1997, Charles D. Roush, an attorney for Himes, made a second offer to settle the case against Botma for the $15,000 policy limits. The letter advised Huser that Botma had been served by publication, that the due date for filing an answer had passed, and that "we are willing to settle Mr. Botma's liability for the limits of his available insurance." Huser would later state that he never received this letter. On April 14, 1997, Huser filed an answer to Himes' complaint—and a counterclaim seeking enforcement of Safeway's alleged acceptance of Himes' first offer to settle the case against Botma for the $15,000 policy limits. In response, Himes denied that her first offer to settle for $15,000 had ever been accepted, and she withdrew her second offer to settle for $15,000. In a one-line letter to Huser dated August 18, 1997, Roush wrote: "The offer to settle contained in my letter of April 3, 1997 is hereby withdrawn."

¶ 5 On September 17, 1997, while deposing Botma, Roush suggested to Botma that he should have a lawyer other than Huser:

[MR. ROUSH:] Has anyone ever suggested to you that you should have a personal attorney, other than Mr. Huser?

[MR. BOTMA:] No.

[MR. ROUSH:] I'm suggesting it to you right now, that it would be in your best interest.

MR. HUSER: I am going to object. You're not giving my client advice here today, Counsel.

MR. ROUSH: I just did.

¶ 6 In a letter dated September 19, 1997, Roush rejected Huser's avowal that he did not receive the April 3, 1997 offer to settle for policy limits, and Roush offered legal advice to Huser:

[G]iven the interrelationship between your firm and Safeway Insurance Company, and given the fact that Mr. Botma may well have a professional negligence claim against your law firm as well as a bad faith claim against Safeway Insurance Company for any excess judgment, I again suggest that he should be provided with independent counsel who can advise him without the conflict you quite clearly have.

Shortly thereafter, Huser and his firm withdrew from representation of Botma, and Safeway hired new counsel for Botma.

¶ 7 In March 2000, Himes and Botma ("Appellants") entered into a "SETTLEMENT AGREEMENT[,] ASSIGNMENT[,] and COVENANT NOT TO EXECUTE," in which Himes agreed not to execute against Botma's personal assets, Botma stipulated to a $12,000,000 judgment against himself, and Botma assigned to Himes any malpractice claim he had against Appellees and any bad faith claim he had against Safeway. Botma also agreed that Himes could file a malpractice action in Botma's name, that Himes could control the case, and that "the proceeds of any judgment in an action brought in [Botma's] name pursuant to this agreement will be assigned to [Himes] following judgment upon request of [Himes]."

¶ 8 Himes' attorneys then filed two new lawsuits: a federal court bad faith action against Safeway and the present state court legal malpractice action against Huser and his law firm ("Appellees"). The complaint alleges that Appellees were negligent in numerous respects, including their failure to accept Himes' second offer to settle for policy limits and their filing a counterclaim seeking enforcement of Safeway's alleged acceptance of Himes' first offer to settle for policy limits. The complaint disclosed the terms of the Botma Himes agreement, and it advised that "although Plaintiff Botma brings this action, and intends to pursue the action, Plaintiff Himes will be the ultimate beneficiary of Plaintiff Botma's claims herein." The complaint prayed for judgment against Appellees in the amount of $12,000,000 plus interest for the judgment against Botma on Himes' complaint, and it prayed for additional special, general, and punitive damages in a sum deemed reasonable by a jury.

¶ 9 Appellees moved to dismiss the complaint, arguing that Arizona prohibits assignment of legal malpractice claims, and, therefore, that the complaint failed to state a claim on which relief could be granted. Appellants asserted that assignment of legal malpractice claims should be allowed in the limited circumstance presented here and, if not, then assignment of the proceeds of such claims should be allowed. Appellants also argued that, in any event, they should be allowed to prosecute the present lawsuit in Botma's name.

¶ 10 The trial court granted the motion to dismiss. Appellants timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes section 12–2101(B) (1994).

## II.

¶ 11 Malpractice claims are regarded as personal injury claims, and personal injury claims are not assignable in Arizona. *Schroeder v. Hudgins,* 142 Ariz. 395, 399, 690 P.2d 114, 118 (App.1984), *abrogation on other grounds recognized by Franko v. Mitchell,* 158 Ariz. 391, 399–400 n. 1, 762 P.2d 1345, 1353–54 n. 1 (App.1988). The *Schroeder* court noted that

> the relationship between attorney and client is of a uniquely personal nature, giving rise to a "fiduciary relation of the very highest character" and that considerations of public policy require that actions arising out of such a relationship not be relegated to the market place and converted to a commodity to be exploited and transferred to economic bidders.

*Id.* (quoting *Goodley v. Wank & Wank, Inc.,* 62 Cal.App.3d 389, 133 Cal.Rptr. 83, 86–87 (1976)).

¶ 12 The *Schroeder–Goodley* reasoning has been cited with approval and followed in the subsequent Arizona cases discussing the issue. In *Kiley v. Jennings, Strouss & Salmon,* 187 Ariz. 136, 927 P.2d 796 (App.1996), the court held that a claim for legal malpractice could not be assigned to a trust. *Id.* at 140, 927 P.2d at 800. In *Standard Chartered PLC v. Price Waterhouse,* 190 Ariz. 6, 945 P.2d 317 (App.1996), the court held that claims for auditor negligence were assignable, but stated that claims for attorney negligence were not assignable because of "the 'uniquely personal' nature of the attorney-client relationship and the duty imposed on the attorney." *Id.* at 16–17, 945 P.2d at 327–28 (quoting *Schroeder,* 142 Ariz. at 399, 690 P.2d at 118).

¶ 13 Several other states have held that legal malpractice claims are not assignable because of public policy concerns similar to those articulated in Arizona and California. *See Brocato v. Prairie State Farmers Ins. Ass'n,* 166 Ill.App.3d 986, 117 Ill.Dec. 849, 520 N.E.2d 1200, 1201–02 (1988); *Picadilly, Inc. v. Raikos,* 582 N.E.2d 338, 341–45 (Ind. 1991); *Coffey v. Jefferson County Bd. of Educ.,* 756 S.W.2d 155, 156–57 (Ky.Ct.App. 1988); *White v. Auto Club Inter–Ins. Exch.,* 984 S.W.2d 156, 160 (Mo.Ct.App.1998); *Zuniga v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 316–18 (Tex.App.1994).

¶ 14 In *Picadilly,* the court observed, "If assignments were permitted, we suspect that they would become an important bargaining chip in the negotiation of settlements—particularly for clients without a deep pocket." 582 N.E.2d at 343. Lawyers involved in settlement negotiations that included an offer to release claims against their clients in exchange for the assignment of the clients' rights to bring a malpractice claim against their attorney "would quickly realize that the interests of their clients were incompatible with their own self-interest." *Id.*

¶ 15 The *Zuniga* court noted that such assignments would enable a plaintiff "to drive a wedge between the defense attorney and his client by creating a conflict of interest" with the result that, "in time, it would become increasingly risky to represent the underinsured, judgment-proof defendant." 878 S.W.2d at 317. Botma was such a defendant, and Himes' attorneys drove such a wedge between Botma and his attorneys. Because "[a] plaintiff who is injured by an uninsured, insolvent defendant has every incentive to look elsewhere for a source of funding," the plaintiff might well "make a deal [with the defendant] and focus on the defense lawyer" for monetary recovery if malpractice assignments were allowed. *Id.*

That is exactly what happened in the present case.

¶ 16 Appellants acknowledge that legal malpractice claims cannot be assigned in Arizona, but they argue for an exception in the *Damron*[1] context—where an insured is also assigning a bad faith/breach of contract claim against an insurance carrier. We decline the invitation to write this exception to the Arizona rule against assignment of personal injury claims. We affirm that "the rule in Arizona against assignment [of personal injury claims] should remain the same until changed by the legislature." *State Farm Fire & Cas. Co. v. Knapp,* 107 Ariz. 184, 185, 484 P.2d 180, 181 (1971) (quoting *Harleysville Mut. Ins. Co. v. Lea,* 2 Ariz.App. 538, 542, 410 P.2d 495, 499 (1966)).

¶ 17 To allow assignment of legal malpractice claims in *Damron*-type situations, or in any situation, would result in more just compensation for some individual plaintiffs, which is desirable, but permitting such assignments would cause immeasurable damage to attorney-client relationships, to the tort system, to the court system, and to the public's sense of justice; it would give too much substance to the cynical belief of some that "lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth." *Zuniga,* 878 S.W.2d at 318.

¶ 18 Appellants argue that even if it is not permissible to assign a legal malpractice claim, it should be permissible to assign the proceeds of such claims. That argument, too, was rejected long ago in Arizona. In *Allstate Insurance Co. v. Druke,* 118 Ariz. 301, 576 P.2d 489 (1978), a class action, the court considered an insurance policy provision that required insureds to "repay Allstate out of the proceeds" received from the tortfeasor. *Id.* at 302, 576 P.2d at 490. The court held that the provision was "unenforceable as an assignment of the insured's cause of action against the third party tortfeasor." *Id.* at 304, 576 P.2d at 492. The court explained:

> Whatever the form, whatever the label, whatever the theory, the result is the same. The policies create an interest in any recovery against a third party for bodily injury. Such an arrangement, if made or contracted for prior to settlement or judgment, is the legal equivalent of an assignment and therefore unenforceable. *Id.*

¶ 19 In *Karp v. Speizer,* 132 Ariz. 599, 647 P.2d 1197 (App.1982), Speizer assigned to the Karps the proceeds he expected to recover in a personal injury case against a third party. *Id.* at 600, 647 P.2d at 1198. Applying *Druke,* we held that the assignment agreement was unenforceable. *Id.* at 602, 647 P.2d at 1200; *see also Brockman v. Metro. Life Ins. Co.,* 125 Ariz. 246, 248, 609 P.2d 61, 63 (1980) (concluding that a "compromise and settlement" agreement was actually an assignment of the proceeds of a personal injury claim and thus was unenforceable); *Lingel v. Olbin,* 198 Ariz. 249, 256, ¶ 18, 8 P.3d 1163, 1170 (App.2000) (concluding that wrongful death proceeds were unassignable); *Lo Piano v. Hunter,* 173 Ariz. 172, 176, 840 P.2d 1037, 1041 (App.1992) (holding that personal injury proceeds may not be assigned to a self-insured trust fund). We reiterate the rule against assignment of the proceeds of legal malpractice and other personal injury claims.

¶ 20 Although neither Botma's malpractice claim nor its proceeds are assignable, his malpractice claim does survive the invalid assignment. *See Monthofer Invs. Ltd. P'ship v. Allen,* 189 Ariz. 422, 425, 943 P.2d 782, 785 (App.1997) (explaining that in *Damron* agreement cases, Arizona courts "have rejected the assertion that a covenant not to execute nullifies the judgment as a recoverable element of damages"). Thus, the fact that Botma entered into a settlement agreement that is in part contrary to Arizona law and unenforceable does not prevent him from suing Appellees for legal malpractice.

¶ 21 Appellants agree that Botma himself could pursue a legal malpractice claim against Appellees, but they argue that they should be allowed to prosecute the present lawsuit in Botma's name. For this position,

1. *Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969).

Appellants rely on the following footnote in *Monthofer:*

> It is one thing to assert that an invalidly assigned claim is an unassigned claim in the eyes of the law and that the assignee cannot pursue the action against a third party or require performance by a reluctant assignor. It is another thing to assert that the assignor forfeits the claim by attempting to assign it.

*Id.* at 426 n. 3, 943 P.2d at 786 n. 3 (citations omitted). Appellants assert that this dictum suggests that Botma can "retain" this present lawsuit. We conclude otherwise.

¶ 22 Botma has nothing to "retain" in the present lawsuit, a lawsuit that can benefit only Himes. As the complaint candidly discloses, the purpose of the assignment agreement "was to allow Plaintiff Himes to recover any and all monies which might be owing to Plaintiff Botma" and that "Plaintiff Himes will be the ultimate beneficiary of Plaintiff Botma's claims herein." To allow the present lawsuit, which was born out of that assignment agreement, to proceed in Botma's name would be to wink at the rule against assignment of legal malpractice claims. The trial court correctly·ruled that this lawsuit cannot proceed in Botma's name.

### III.

¶ 23 The trial court's judgment is in all respects affirmed.

CONCURRING: JEFFERSON L. LANKFORD, Presiding Judge and JAMES B. SULT, Judge.