## WALTER GURSKI v. ROSENBLUM AND FILAN, LLC, ET AL.
### (SC 17426)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

---

Argued September 21—officially released November 22, 2005

*Frederick L. Murolo*, with whom were *Karen T. Murolo* and, on the brief, *Nadine M. Pare* and *Richard A. Roberts*, for the appellants-appellees (defendants).

*A. Reynolds Gordon*, with whom was *Frank A. DeNicola, Jr.*, for the appellee-appellant (plaintiff).

*Opinion*

KATZ, J. The dispositive issue in this appeal is whether a client may assign a legal malpractice claim or the proceeds from such a claim to the client's adversary in the underlying litigation. The defendants, the law firm of Rosenblum and Filan, LLC, and one of its principals, James Rosenblum (law firm), appeal from the judgment of the trial court, rendered in accordance with a jury verdict in favor of the plaintiff, Walter Gurski.[1] We conclude that an assignment of a legal malpractice claim or the proceeds from such a claim to an adversary in the same litigation that gave rise to the

---

[1] In his amended complaint, Gurski also named as a defendant Jennifer Hally, an attorney who had practiced with the law firm during the period relevant to Gurski's malpractice claim. Gurski subsequently withdrew his claims against Hally. References herein to the law firm are to the firm itself and Rosenblum.

alleged malpractice is against public policy and thereby unenforceable. Accordingly, we reverse the judgment.

The record discloses the following facts and procedural history. On or about May 12, 1994, Gurski filed a voluntary petition for bankruptcy under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 et seq. The United States Bankruptcy Court for the District of Connecticut issued an automatic stay of postpetition actions against Gurski's property pursuant to 11 U.S.C. § 362 (a). Thereafter, in 1997, Susan Lee commenced an action against Gurski, a podiatrist, for malpractice, alleging that, as a result of Gurski's negligent and careless treatment of her feet in 1995 and 1996, she was permanently injured and required further treatment and corrective surgery.[2] Gurski notified his insurance carrier, AIG Insurance Company (AIG), which retained the law firm to represent Gurski. Subsequently, by letter dated December 15, 1997, AIG informed Gurski that the action filed by Lee was not covered under his policy and, accordingly, that it no longer would provide a defense or indemnification. The law firm thereafter informed Gurski in a letter dated December 17, 1997, and in subsequent oral communications that, because he had no coverage under the AIG policy, he would need to retain other counsel. In a letter dated July 6, 1998, the law firm notified Gurski that it had filed a motion to withdraw its appearance, that he should plan to attend a court hearing on that motion, and that he needed to retain new counsel. On July 9, 1998, the law firm notified Gurski that the court had scheduled a hearing for settlement discussions in Lee's action on July 22, 1998, and that he should appear at that time.

---

[2] On or about June 3, 1998, Lee filed a motion for relief from the stay, seeking an order permitting her to proceed with the malpractice action against Gurski. Over Gurski's objection, on August 25, 1998, the Bankruptcy Court ordered that Lee be permitted to proceed with the malpractice action, but not to execute on assets of the estate.

The hearing went forward and, because neither Gurski nor the law firm appeared, the court entered a default judgment against Gurski. In a letter dated August 11, 1998, the law firm notified Gurski of the default judgment, advised him of another hearing scheduled for August 27, 1998, and counseled him to attend that hearing. The law firm repeated therein that it did not represent him and that the court likely would grant its motion to withdraw shortly. By letter dated October 16, 1998, the law firm informed Gurski that the motion to withdraw its appearance was scheduled for October 19, 1998. The trial court, *Holzberg, J.*, granted that motion on October 20, 1998. There is nothing in the record reflecting that Gurski was notified of that decision.[3]

On November 16, 1998, Gurski received a certificate of closed pleadings notifying him that, on November 12, 1998, Lee had claimed the malpractice case to a hearing in damages. Seeking advice, Gurski forwarded that document to another law firm, O'Donnell, McDonald and Cregeen, LLC (O'Donnell), which responded on December 8, 1998, notifying Gurski that the trial court had granted the law firm's motion to withdraw on October 20, 1998, and advising him to seek other counsel as soon as possible. Additionally, O'Donnell advised Gurski that, because the default judgment in favor of Lee had entered during the period before the Bankruptcy Court granted Lee's motion for relief from the stay; see footnote 2 of this opinion; the court would likely open the default judgment. Despite his efforts to retain counsel, Gurski was unsuccessful, and, because he had not entered a pro se appearance, he was not notified of the December 21, 1998 hearing in damages at which judgment entered against him for $152,000. In January, 1999, after judgment had been rendered for Lee, Gurski retained counsel, who thereafter moved to

---

[3] It appears that Gurski did not receive notice of court proceedings because he neither had filed an appearance nor had retained counsel.

open the judgment. The trial court denied the motion to open, concluding that "[Gurski] was fully advised of the entry of the default, the hearing in damages and the entry of judgment. Having failed to take reasonable steps to respond to the notice of these proceedings and having failed to demonstrate that he failed to appear because of mistake, accident or other reasonable [cause], the motion to [open] is denied."

Under bankruptcy law, the judgment in favor of Lee was considered an administrative claim and was not subject to being discharged in Gurski's pending bankruptcy proceedings. Gurski's assets were insufficient to pay both the amount of the judgment in favor of Lee and the payments required under the plan of reorganization that Gurski had filed in the Bankruptcy Court. As a consequence, on October 15, 1999, following lengthy settlement negotiations with Lee, Gurski filed a motion to compromise with the Bankruptcy Court regarding the judgment against him. In an attempt to move his chapter 11 case to confirmation, and because he did not have sufficient funds to liquidate Lee's claim, Gurski proposed a compromise predicated on a legal malpractice claim his bankruptcy estate held against the law firm. Lee agreed, dependent upon specific conditions, to compromise her claim against the estate.[4] On Decem-

---

[4] The motion to compromise provided that Lee would agree "to compromise her claim against the estate in exchange for the following: (a) The estate will prosecute its legal malpractice claim against [the law firm]. (b) The estate will assign any recovery from this action to [Lee] and grant her a security interest therein, *up to* the amount of her judgment. (c) Special counsel hired to prosecute the malpractice action will be retained on a one-third contingency fee and [Lee's] interest in the recovery is subject to those fees and to any costs advanced in the prosecution of the case. (d) Any amount paid to [Lee] from the malpractice case, *up to* the amount of her judgment, shall be deemed to be in full and complete satisfaction of her claim against the estate, which is otherwise irrevocably released. (e) Any amounts recovered in the malpractice case in excess of attorney's fees, costs and the lien of [Lee] shall constitute estate property to be distributed in accordance with the Bankruptcy Code." (Emphasis in original.)

ber 21, 1999, the Bankruptcy Court granted the motion to compromise, subject to the following orders: "(1) [Gurski] may compromise the claim against the [bankruptcy] estate held by [Lee] by assigning to her the estate's interest in a certain legal malpractice claim it holds against the [l]aw [f]irm . . . (2) [Gurski] may also grant [Lee] a security interest in said malpractice claim up to the maximum amount of $152,000.00 . . . (3) [Lee's] claim against [Gurski] is limited solely and exclusively to any recovery which may be obtained in the malpractice claim up to $152,000.00 and any other claim is hereby ordered expunged . . . (4) [t]he estate is authorized to retain special counsel to prosecute the malpractice claim on a one-third contingency fee basis . . . [and] (5) [Lee's] right to recovery is subject to special counsel's claim for attorney's fees and expenses, all of which shall be submitted to this [c]ourt on appropriate application, notice and hearing." These conditions, in conjunction with the terms set forth in Gurski's motion to compromise; see footnote 4 of this opinion; constitute the terms of the assignment at issue in this appeal.

In accordance with his obligation under the compromise, Gurski commenced the present action against the law firm, alleging that its negligence and breach of contract were a proximate cause of his injury—the $152,000 judgment, plus interest and costs expended in an effort to open the judgment. The law firm filed several special defenses, including a challenge to the assignment as violative of public policy. The law firm also filed a motion in limine seeking to exclude evidence of the assignment as irrelevant and prejudicial. The trial court, *Tobin, J.*, conditionally granted the motion. The legal malpractice action was tried to a jury. At the conclusion of Gurski's case, the law firm moved for a directed verdict, challenging, inter alia, the enforceability of the assignment. In denying the motion, the trial

court noted that, up to that point in the trial, there had been no evidence of such an assignment. At the conclusion of the law firm's case, the parties agreed by stipulation that the issue of the assignment would be reserved for decision by the court. Accordingly, pursuant to that agreement, the jury was not told of the assignment.

The jury concluded that Gurski had not breached the standard of care when treating Lee and that the law firm had breached the standard of care when representing Gurski. Accordingly, it returned a verdict in favor of Gurski for $220,318, which included $136,800 in economic damages and $83,518 in interest. Although the only evidence of damages offered during the trial was a judgment against Gurski in the amount of $152,000, the jury determined that the gross economic damages were $177,000, which they reduced by $25,000 based on the estimated costs that Gurski, who was uninsured, would have incurred in defending the underlying medical malpractice action. The jury further reduced the award by 10 percent for Gurski's comparative negligence, resulting in the final award of economic damages of $136,800.

The law firm filed a motion to set aside the verdict and, thereafter, a motion for judgment notwithstanding the verdict, claiming, inter alia, that, as a matter of public policy, it is improper for a party to assign a legal malpractice claim to an adversarial party in the underlying litigation. Therefore, according to the law firm, the verdict on the malpractice claim should not be enforced. In a comprehensive opinion, the trial court recognized and followed the majority of jurisdictions holding that legal malpractice claims are considered personal torts that may not be assigned. The trial court then identified a distinction recognized by some jurisdictions between an assignment of the underlying claim and an assignment of the proceeds from that claim.

Following that distinction, the trial court concluded that Connecticut's public policy does not prohibit the assignment of the proceeds, even when it would prohibit the assignment of the underlying action itself. Accordingly, the trial court denied both the motion to set aside the verdict and the motion for judgment notwithstanding the verdict.

The law firm also filed a motion for remittitur, which the trial court granted in part. Specifically, the court reduced the gross damages to $114,300 because the only evidence of damages was Lee's judgment in the amount of $152,000. The court also reduced the jury's award of interest to simple interest of $54,644.79. Gurski conditionally agreed to accept the remittitur subject to the law firm's agreement that if it were to appeal the verdict, he would be permitted to appeal the remittitur. This appeal and cross appeal followed.[5]

The law firm claims, inter alia, that the trial court improperly denied its motion for a directed verdict and its motion for judgment notwithstanding the verdict because: (1) Gurski's action against the law firm had been an invalid assignment of a legal malpractice action and thus void as against public policy; (2) Gurski had failed to present expert testimony that the law firm's breach of the standard of care proximately caused his damages; and (3) Gurski had not sustained any damages as a result of the law firm's conduct in that he was not personally liable to Lee for the $152,000 judgment against him.[6] We conclude that neither a legal malprac-

---

[5] The law firm appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c). See Practice Book § 65-1.

[6] The law firm also claims that the trial court improperly: (1) instructed the jury that it could consider claims of negligence in the complaint for which Gurski had failed to offer any expert testimony; (2) permitted Gurski to present evidence that the default that had entered against him was based on the law firm's intentional conduct; (3) refused to charge the jury on waiver and estoppel; and (4) instructed the jury that it could award interest pursuant to General Statutes § 37-3b.

tice claim nor the proceeds from such a claim can be assigned to an adversary in the same litigation that gave rise to the alleged malpractice, and we reverse the judgment accordingly.[7]

We first note the standard of review we apply to this issue. The question of whether an assignment is barred as a matter of public policy is an issue of law. See *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 588, 693 A.2d 293 (1997) (question of whether challenged discharge violates public policy is question of law). Accordingly, our review is plenary. *Prescott* v. *Meriden*, 273 Conn. 759, 764, 873 A.2d 175 (2005).

In deciding this question, we begin with certain general principles that typically guide our inquiry as to the issue of assignability. In *Rumbin* v. *Utica Mutual Ins. Co.*, 254 Conn. 259, 267–68, 757 A.2d 526 (2000), we recognized, with respect to assignment of contract claims, "the modern approach to contracts reject[ing] traditional common-law restrictions on the alienability of contract rights in favor of free assignability of contracts. See 3 Restatement (Second), Contracts § 317, p. 15 (1981) ([a] contractual right can be assigned); J. Murray, Jr., Contracts (3d Ed. 1990) (the modern view is that contract rights should be freely assignable); 3 E. Farnsworth, Contracts (2d Ed. 1998) § 11.2, p. 61 ([t]oday most contract rights are freely transferable). Common-law restrictions on assignment were abandoned when courts recognized the necessity of permitting the transfer of contract rights. The force[s] of human convenience and business practice [were] too strong for the common-law doctrine that [intangible contract rights] are not assignable. . . . J. Murray, Jr., supra, § 135, p. 791." (Internal quotation marks omitted.)

---

[7] Consequently, we need not address the law firm's remaining claims nor Gurski's cross appeal on the remittitur.

We have taken a contrary position, however, with respect to whether a tort claim can be assigned, at least when the claim is based on personal injury. In *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 384, 698 A.2d 859 (1997), although we ultimately concluded that the action at issue was a contract action rather than a tort action, we acknowledged certain well settled principles as to such assignments: "Under common law a cause of action for personal injuries cannot be assigned, and in the absence of a statutory provision to the contrary a right of action for personal injuries resulting from negligence is not assignable before judgment. . . . It seems that few legal principles are as well settled, and as universally agreed upon, as the rule that the common law does not permit assignments of causes of action to recover for personal injuries. . . . The rule was early recognized in Connecticut. See *Whitaker* v. *Gavit*, 18 Conn. 522, 526 [1847]. The reasons underlying the rule have been variously stated: unscrupulous interlopers and litigious persons were to be discouraged from purchasing claims for pain and suffering and prosecuting them in court as assignees; actions for injuries that in the absence of statute did not survive the death of the victim were deemed too personal in nature to be assignable; a tort-feasor was not to be held liable to a party unharmed by him; and excessive litigation was thought to be reduced." (Citations omitted; internal quotation marks omitted.) *Dodd* v. *Middlesex Mutual Assurance Co.*, supra, 382–83; accord *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, 236 Conn. 362, 370, 672 A.2d 939 (1996) (noting "long-standing rule that personal injury actions may not be assigned").

Because an action for legal malpractice can be pleaded either in contract or in tort; *Krawczyk* v. *Stingle*, 208 Conn. 239, 245, 543 A.2d 733 (1988); neither *Dodd* nor *Rumbin*, nor their labels, are helpful in the

present case.[8] Therefore, rather than strain to fit each legal malpractice claim into a category often determined by counsel based on concerns not relevant to the inquiry at hand, we think the better approach is to resolve the issue uniformly on the basis of public policy. See *Picadilly, Inc.* v. *Raikos*, 582 N.E.2d 338, 341 (Ind. 1991) (noting that several jurisdictions have recognized that legal malpractice could be characterized as either assignable contract actions or nonassignable personal injury actions and instead have determined issue on basis of public policy).

Although this appeal raises an issue of first impression in Connecticut, many other jurisdictions have considered whether a legal malpractice claim may be assigned. A majority of those jurisdictions have concluded that legal malpractice claims are not assignable based on several overlapping public policy considerations.[9] Many of those courts discuss the unique and

---

[8] Indeed, it would make no sense to craft a rule, ostensibly based on public policy considerations, regarding the assignability of a legal malpractice action that the parties simply could avoid based on how they frame their pleadings.

[9] The seminal case on this issue is *Goodley* v. *Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 395–96, 133 Cal. Rptr. 83 (1976), and the following jurisdictions have relied on some or all of the concerns cited in *Goodley* as a basis for concluding that assignments of legal malpractice actions are violative of public policy: *Alcman Services Corp.* v. *Samuel H. Bullock, P.C.*, 925 F. Sup. 252, 256–58 (D.N.J. 1996) (applying New Jersey law), aff'd, 124 F.3d 185 (3d Cir. 1997); *Botma* v. *Huser*, 202 Ariz. 14, 17, 39 P.3d 538 (App. 2002); *Roberts* v. *Holland & Hart*, 857 P.2d 492, 495–96 (Colo. App.), cert. denied, 1993 Colo. LEXIS 728 (1993); *Wilson* v. *Coronet Ins. Co.*, 293 Ill. App. 3d 992, 994, 689 N.E.2d 1157 (1997); *Rosby Corp.* v. *Townsend, Yosha, Cline & Price*, 800 N.E.2d 661, 664–67 (Ind. App. 2003); *Bank IV Wichita* v. *Arns, Mullins, Unruh, Kuhn & Wilson*, 250 Kan. 490, 498–99, 827 P.2d 758 (1992); *Coffey* v. *Jefferson County Board of Education*, 756 S.W.2d 155, 156–57 (Ky. App. 1988); *Joos* v. *Drillock*, 127 Mich. App. 99, 105–106, 338 N.W.2d 736 (1983), appeal denied, 419 Mich. 935 (1984); *Wagener* v. *McDonald*, 509 N.W.2d 188, 191–93 (Minn. App. 1993); *Freeman* v. *Basso*, 128 S.W.3d 138, 142 (Mo. App. 2004); *Earth Science Laboratories* v. *Adkins & Wondra, P.C.*, 246 Neb. 798, 801–802, 523 N.W.2d 254 (1994); *Can Do, Inc., Pension & Profit Sharing Plan* v. *Manier, Herod, Hollabaugh & Smith*, 922 S.W.2d 865, 868–69 (Tenn.), cert. denied, 519 U.S. 929, 117 S. Ct. 298, 136 L. Ed. 2d

personal nature of the relationship between attorney and client and the need to preserve the sanctity of that relationship as a reason for prohibiting the assignment. See, e.g., *Schroeder* v. *Hudgins*, 142 Ariz. 395, 399, 690 P.2d 114 (App. 1984) (assignment of legal malpractice claims barred, citing "uniquely personal" relationship between attorney and client); *Goodley* v. *Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 397, 133 Cal. Rptr. 83 (1976) (citing "unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment"); *Roberts* v. *Holland & Hart*, 857 P.2d 492, 495 (Colo. App.), cert. denied, 1993 Colo. LEXIS 728 (1993) ("the assignment of legal malpractice claims involve matters of personal trust and personal service and do not lend themselves to assignability because permitting the transfer of such claims would undermine the important relationship between an attorney and client"); *Christison* v. *Jones*, 83 Ill. App. 3d 334, 338, 405 N.E.2d 8 (1980) (prohibiting assignment due to "the personal nature of the [attorney-client] relationship and the duty imposed upon the attorney, coupled with public policy considerations surrounding that relationship"); *Joos* v. *Drillock*, 127 Mich. App. 99, 105, 338 N.W.2d 736 (1983) (citing "personal nature of the attorney-client relationship" and other public policy concerns), appeal denied, 419 Mich. 935 (1984); *Earth Science Laboratories* v.

216 (1996); *MNC Credit Corp.* v. *Sickels*, 255 Va. 314, 317–18, 497 S.E.2d 331 (1998); *Delaware CWC Liquidation Corp.* v. *Martin*, 213 W. Va. 617, 621–23, 584 S.E.2d 473 (2003). Although Florida has permitted the assignment of a malpractice claim under limited circumstances, it does not permit assignment when the malpractice claim arises out of litigation. See *Cowan Liebowitz & Latman, P.C.* v. *Kaplan*, 902 So. 2d 755, 759–61 (Fla. 2005) (noting that "vast majority" of assignments barred but permitting assignment of malpractice claim stemming from drafting of private placement memorandum because memorandum intended for publication to third parties and thus attorney owed duty of loyalty to public).

*Adkins & Wondra, P.C.*, 246 Neb. 798, 801–802, 523 N.W.2d 254 (1994) (refusing to permit assignment because of "personal nature and confidentiality involved in the attorney-client relationship"); *Delaware CWC Liquidation Corp.* v. *Martin*, 213 W. Va. 617, 621–23, 584 S.E.2d 473 (2003) ("[t]o permit the assignment of a claim that is firmly rooted in the highly personal attorney-client relationship would denigrate both the legal profession and the justice system").

In that same vein, courts also have pointed to the incompatibility of the assignment and the attorney's duty of loyalty and confidentiality in rejecting assignments of legal malpractice claims. See, e.g., *Kiley* v. *Jennings, Strouss & Salmon*, 187 Ariz. 136, 140, 927 P.2d 796 (App. 1996) (such assignments would negate attorney's fiduciary and ethical duty to client because assignee is not client); *Goodley* v. *Wank & Wank, Inc.*, supra, 62 Cal. App. 3d 397 (to allow such assignments would "embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client"); *Picadilly, Inc.* v. *Raikos*, supra, 582 N.E.2d 342 (same); *Wagener* v. *McDonald*, 509 N.W.2d 188, 191 (Minn. App. 1993) (allowing such assignments "would be incompatible with the attorney's duty to act loyally towards the client . . . [and] to maintain confidentiality" [citation omitted]).

Courts also have cautioned that permitting the assignment of legal malpractice claims would encourage the commercialization of such claims and in turn spawn increased and unwarranted malpractice actions. See, e.g., *Goodley* v. *Wank & Wank, Inc.*, supra, 62 Cal. App. 3d 397 ("The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom

the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, [and] promote champerty . . . ."); *Wagener* v. *McDonald*, supra, 509 N.W.2d 191–93 (quoting "commodity" concerns raised by California court in *Goodley*); *White* v. *Auto Club Inter-Ins. Exchange*, 984 S.W.2d 156, 160 (Mo. App. 1998) (agreeing with this concern as articulated by California court in *Goodley*).

In rejecting the assignment of a legal malpractice claim as against public policy, courts also have expressed concern that allowing an assignment would make attorneys hesitant to represent insolvent, underinsured or judgment proof defendants for fear that the malpractice claims would be used as tender. See, e.g., *Botma* v. *Huser*, 202 Ariz. 14, 17, 39 P.3d 538 (App. 2002) ("[S]uch assignments would enable a plaintiff 'to drive a wedge between the defense attorney and his client by creating a conflict of interest' with the result that, 'in time, it would become increasingly risky to represent the underinsured, judgment-proof defendant.' [*Zuniga* v. *Groce, Locke & Hebdon*, 878 S.W.2d 313, 317 (Tex. App. 1994)]. . . . Because '[a] plaintiff who is injured by an uninsured, insolvent defendant has every incentive to look elsewhere for a source of funding,' the plaintiff might well 'make a deal [with the defendant] and focus on the defense lawyer' for monetary recovery if malpractice assignments were allowed."); *Goodley* v. *Wank & Wank, Inc.*, supra, 62 Cal. App. 3d 397 ("the ever present threat of assignment and the possibility

that ultimately the attorney may be confronted with the necessity of defending himself against the assignee of an irresponsible client who, because of dissatisfaction with legal services rendered and out of resentment and/or for monetary gain, has discounted a purported claim for malpractice by assigning the same, would most surely result in a selective process for carefully choosing clients thereby rendering a disservice to the public and the profession").

The final consideration cited by several jurisdictions barring assignment of legal malpractice claims pertains specifically to an assignment of such a claim to the adverse party in the underlying action and the potential for a reversal of roles that could undermine the legitimacy of the malpractice judgment. See, e.g., *Kracht* v. *Perrin, Gartland & Doyle*, 219 Cal. App. 3d 1019, 1024–25, 268 Cal. Rptr. 637 (1990) ("[A] malpractice suit filed by the former adversary is 'fraught with illogic' . . . and unseemly arguments: In the former lawsuit [the plaintiff] judicially averred and proved she was entitled to recover against [judgment debtor]; but in the [subsequent] malpractice lawsuit [the plaintiff] must judicially aver that, but for [the] attorney's negligence, she was not entitled to have recovered against [the judgment debtor]. Reduced to its essence, [the plaintiff's] argument in the malpractice action is 'To the extent I was not entitled to recover, I am now entitled to recover.' " [Citation omitted.]); *Picadilly, Inc.* v. *Raikos*, supra, 582 N.E.2d 344–45 ("Our decision to bar the assignment of these claims is also grounded on a highly practical consideration: the trial of this assigned malpractice claim would feature a public and disreputable role reversal. The mechanics of trying this case would magnify the least attractive aspects of the legal system. . . . In [the malpractice action], [the assignee] and his lawyer . . . must necessarily bear the burden of proving a proposition directly contrary to the proposition they

successfully proved in [the underlying personal injury action]. They now assert that it was [the assignor's] attorneys, and not [the assignor's conduct], that led the jury to award $150,000 in punitive damages. Because of the unique nature of the trial within a trial, [the assignee's] change in position would be obvious to all the jurors hearing the evidence in [the malpractice action]. They would rightly leave the courtroom with less regard for the law and the legal profession than they had when they entered." [Citations omitted.]); *Freeman* v. *Basso*, 128 S.W.3d 138, 142 (Mo. App. 2004) ("Here, we are faced with a situation in which the parties attempting to bring a claim for legal malpractice are the very parties who benefited from that malpractice [assuming that it occurred] during a previous stage of this litigation. The Missouri rule against assignment was created precisely so as to prevent this type of counterintuitive claim."); see also *Alcman Services Corp.* v. *Samuel H. Bullock, P.C.*, 925 F. Sup. 252, 256–58 (D.N.J. 1996) (barring assignment on grounds of judicial estoppel and public policy, relying on court's reasoning in *Zuniga* v. *Groce, Locke & Hebdon*, supra, 878 S.W.2d 318, discussed herein), aff'd, 124 F.3d 185 (3d Cir. 1997). Several of these courts have noted that such assignments create an opportunity and incentive for collusion. See, e.g., *Coffey* v. *Jefferson County Board of Education*, 756 S.W.2d 155, 156–57 (Ky. App. 1988) (principally rejecting assignment because facts suggested collusion between assignor and assignee); *Wagener* v. *McDonald*, supra, 509 N.W.2d 191 (noting risk of collusion in assignment to adverse party in underlying action).

In examining all of the aforementioned considerations, we are not persuaded that every voluntary assignment of a legal malpractice action should be barred as a matter of law.[10] Indeed, there is a significant minority

---

[10] The Massachusetts Supreme Judicial Court noted that the courts imposing a per se bar on the assignment of legal malpractice claims on public policy grounds often have failed to distinguish between voluntary and involuntary

view that rejects a per se bar on assignments, questioning the rationale of some of the public policy considerations cited by the majority view and favoring instead a case-by-case determination when meritorious public policy concerns actually are implicated. See *Richter* v. *Analex Corp.*, 940 F. Sup. 353, 356–58 (D.D.C. 1996) (concluding that assignment not barred under facts of case when successor company asserted malpractice as counterclaim against predecessor company's counsel; determining that no policy concerns implicated because claim sold to uninterested party and purely pecuniary harm at issue); *Thurston* v. *Continental Casualty Co.*, 567 A.2d 922, 923 (Me. 1989) (An assignment was permitted under the specific facts of the case wherein the defendant in the underlying action assigned to the plaintiff a claim against the defendant's insurer and the insurer's attorney for failure to defend or settle; the court reasoned that the policy concern about creating a commercial market for claims was inapplicable because "this assignee has an intimate connection with the underlying lawsuit" and rejecting as unpersuasive other policy concerns: "A legal malpractice claim is not for personal injury, but for economic harm. . . . The argument that legal services are personal and involve confidential attorney-client relationships does not justify preventing a client . . . from realizing the value of its malpractice claim in what may be the most efficient

---

assignments and further noted that public policy concerns do not effect the two types equally. See *New Hampshire Ins. Co.* v. *McCann*, 429 Mass. 202, 209–12, 707 N.E.2d 332 (1999); see also comment, T. Bell, "Limits on the Privity and Assignment of Legal Malpractice Claims," 59 U. Chi. L. Rev. 1533, 1540–46 (1992) (noting different treatment by courts of voluntary and involuntary assignments and arguing that policy concerns have different implications in each context); T. Bell, supra, 1543 (defining "voluntary assignment" as one "undertaken with the full consent of assignor and assignee" and "involuntary assignment" as one that "take[s] place by operation of law, and typically put[s] the legal malpractice claim in the hands of a deceased client's estate, a trustee or creditor in bankruptcy, or a subrogating insurer").

way possible, namely, its assignment to someone else with a clear interest in the claim who also has the time, energy and resources to bring the suit." [Citations omitted.]); *New Hampshire Ins. Co.* v. *McCann*, 429 Mass. 202, 209–12, 707 N.E.2d 332 (1999) (stating that some concerns cited are "farfetched"; rejecting, inter alia, concern about disclosure of confidential information on ground that client assignor knowingly waives confidentiality by making assignment and concern about increased litigation on ground that there is no evidence of such increases); *Chaffee* v. *Smith*, 98 Nev. 222, 223–24, 645 P.2d 966 (1982) (assignment of previously unasserted claim barred because decision whether to bring such action is one "peculiarly vested" in client, but leaving open question of whether assignment is permitted if malpractice action already has been initiated); *Greevy* v. *Becker, Isserlis, Sullivan & Kurtz*, 240 App. Div. 2d 539, 541, 658 N.Y.S.2d 693 (1997) (assignment to plaintiff in underlying personal injury action not barred as contrary to public policy); *Gregory* v. *Lovlien*, 174 Or. App. 483, 488, 26 P.3d 180 (noting that legal malpractice action is tort but typically is based on purely economic loss), rev. denied, 333 Or. 74, 36 P.3d 974 (2001); *Hedlund Mfg. Co.* v. *Weiser, Stapler & Spivak*, 517 Pa. 522, 525–26, 539 A.2d 357 (1988) (The court concluded that legal malpractice action involves a pecuniary interest and, thus, was not barred under the rule precluding the assignment of a personal injury claim, and rejected the public policy argument that the attorney-client relationship must be protected: "We will not allow the concept of the attorney-client relationship to be used as a shield by an attorney to protect him or her from the consequences of legal malpractice. Where the attorney has caused harm to his or her client, there is no relationship that remains to be protected."); *Cerberus Partners, L.P.* v. *Gadsby & Hannah*, 728 A.2d 1057, 1059–61 (R.I. 1999) (questioning policy concerns

generally and concluding that assignment not barred under specific facts of case, where commercial loan agreement was assigned and assignee brought malpractice action against attorney who represented original lender in commercial loan transaction; contrasting majority of cases barring assignment wherein legal malpractice claim is transferred to person without any other rights or obligations being transferred along with it); *Kommavongsa* v. *Haskell*, 149 Wash. 2d 288, 291, 67 P.3d 1068 (2003) (questioning validity of policy arguments barring all assignments but finding persuasive policy arguments regarding assignment to party in underlying action); see also *Tate* v. *Goins, Underkofler, Crawford & Langdon*, 24 S.W.3d 627, 633 (Tex. App. 2000) (recognizing validity of some of policy arguments but allowing assignments in certain situations).

Notably, however, of those jurisdictions that permit the assignment of a legal malpractice claim on a case-by-case basis, two jurisdictions, Texas and Washington, preclude assignment of legal malpractice actions when, as here, the assignment is to an adverse party in the underlying action.[11] See *Tate* v. *Goins, Underkofler, Crawford & Langdon*, supra, 24 S.W.3d 633 (noting "evils" of assignment to party in underlying proceedings); *Kommavongsa* v. *Haskell*, supra, 149 Wash. 2d 307 (The court concluded that many policy concerns are overstated but determined "that permitting the assignment of legal malpractice claims to an adversary in the same litigation that gave rise to the legal malpractice claim ought to be prohibited because of the opportunity and incentive for collusion in stipulating to damages in exchange for a covenant not to execute judgment in the underlying litigation . . . . [T]he 'trial

---

[11] There are a few jurisdictions that have permitted the assignment of a legal malpractice claim to an adverse party, but those courts neither recognize nor provide any discussion of the policy concern regarding inconsistent positions. See *Thurston* v. *Continental Casualty Co.*, supra, 567 A.2d 923; *Greevy* v. *Becker, Isserlis, Sullivan & Kurtz*, supra, 240 App. Div. 540–41.

within a trial' that necessarily characterizes most legal malpractice claims arising from the same litigation that gave rise to the malpractice claim would lead to abrupt and shameless shift of positions that would give prominence [and substance] to the perception that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth, thereby demeaning the legal profession . . . ."); see also *Weiss* v. *Leatherberry*, 863 So. 2d 368, 371 (Fla. App. 2003) (barring assignment to adversary in underlying litigation solely on ground that injury is personal to client and, thus, claim can be asserted only by client, but facts reflect that malpractice claim arose from settlement and no risk of inconsistent positions); *Otis* v. *Arbella Mutual Ins. Co.*, 443 Mass. 634, 824 N.E.2d 23 (2005) (barring assignment under doctrine of judicial estoppel where assignee was adverse party in underlying action and took inconsistent positions); *New Hampshire Ins. Co.* v. *McCann*, supra, 429 Mass. 211 (not barring assignment but noting that risk of inconsistent position was not implicated in this case because merits of underlying action were immaterial to malpractice case).

Thus, although not instituting a per se rule precluding a voluntary assignment, these courts have echoed the policy concerns cited by the majority jurisdictions that disapprove of an assignment to an adverse party in the underlying action because it would "necessitate a duplicitous change in the positions taken by the parties in [the] antecedent litigation." *Tate* v. *Goins, Underkofler, Crawford & Langdon*, supra, 24 S.W.3d 633. Perhaps the best discussion of the problems associated with an assignment under these circumstances is in *Zuniga* v. *Groce, Locke & Hebdon*, supra, 878 S.W.2d 318. In barring the assignment of the malpractice claim arising from litigation, the Texas Court of Appeals recognized therein that, "[t]he two litigants would have to

take positions diametrically opposed to their positions during the underlying litigation because the legal malpractice case requires a 'suit within a suit.' . . . For the law to countenance this abrupt and shameless shift of positions would give prominence (and substance) to the image that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth. . . . It is one thing for lawyers in our adversary system to represent clients with whom they personally disagree; it is something quite different for lawyers (and clients) to switch positions concerning the same incident simply because an assignment and the law of proximate cause have given them a financial interest in switching." (Citations omitted.) Id.; accord *Alcman Services Corp.* v. *Samuel H. Bullock, P.C.*, supra, 925 F. Sup. 256–58; *Kracht* v. *Perrin, Gartland & Doyle*, supra, 219 Cal. App. 3d 1024–25; *Picadilly, Inc.* v. *Raikos*, supra, 582 N.E.2d 344–45.

This counterintuitive claim and reversal of roles, requiring the assignee to bring a claim for legal malpractice when she was the very party who benefited from that malpractice in the underlying litigation, would engender a perversion that would erode public confidence in the legal system. See *Freeman* v. *Basso*, supra, 128 S.W.3d 138. Permitting an assignment of a legal malpractice claim to the adversary in the underlying litigation that gave rise to the legal malpractice claim also creates the opportunity and incentive for collusion in stipulating to damages in exchange for an agreement not to execute on the judgment in the underlying litigation. Thus, the Texas and Washington courts, although adopting the minority position against a per se bar, nonetheless have agreed with the majority view that these policy considerations were compelling reasons to bar the assignment of a legal malpractice claim to

an adversary in the underlying litigation that gave rise to the legal malpractice claim.

In the present case, Lee sued Gurski in the underlying action alleging that Gurski had been negligent in his treatment of her. In Gurski's legal malpractice action, in order to prevail, he would have had to prove that he had not been negligent and that he would have prevailed in Lee's medical malpractice action against him but for his law firm's negligence. Once Gurski assigned any or all of the interest in the malpractice action to Lee, however, the interests of these two former adversaries merged, and Lee had a vested interest in the jury's determination that Gurski had *not* been negligent.[12]

Under these circumstances, we agree with the reasoning of the Texas and Washington courts; see *Tate* v. *Goins, Underkofler, Crawford & Langdon*, supra, 24 S.W.3d 633; *Zuniga* v. *Groce, Locke & Hebdon*, supra, 878 S.W.2d 318; *Kommavongsa* v. *Haskell*, supra, 149 Wash. 2d 288; that public policy considerations warrant the barring of an assignment of a legal malpractice

---

[12] Gurski asserts the following arguments in support of his contention that, under the facts of this case, the role reversal problem is not implicated: (1) Lee did not testify at trial that Gurski had not been negligent; (2) that policy concern applies only to directly contradictory positions and not to hedging or downplaying a claim, as the law firm suggests Lee may have done here; and (3) the jury could evaluate Lee's credibility and, to the extent that the jury would not have considered the effect of the assignment on her testimony, the law firm assumed that consequence by seeking to exclude evidence of the assignment. We disagree with each of these contentions.

First and foremost, we reject Gurski's approach, which would require the courts to engage in a fact and record intensive inquiry in each case, and decide the better approach is to adopt a blanket prohibition on assignments on legal malpractice claims to adverse parties in the underlying action. We also are mindful of the fact that the risks from slight inconsistencies in positions arguably are greater than that from completely inconsistent positions, as the latter would be obvious to all. Finally, we are not inclined to force a litigant in the law firm's position to have to choose between putting the assignment before the jury, which could sway them to find in Gurski's favor to compensate Lee for her injury, and excluding the assignment, which could impair the law firm's ability to impeach Lee's motives.

action to an adversary in the underlying litigation. As the Indiana Supreme Court aptly expressed, such assignments "feature a public and disreputable role reversal" and "magnify the least attractive aspects of the legal system," such that jurors in the legal malpractice action witnessing such role reversals "would rightly leave the courtroom with less regard for the law and the legal profession than they had when they entered." *Picadilly, Inc.* v. *Raikos*, supra, 582 N.E.2d 344–45. Thus, independent of other public policy considerations—allowing assignments would: convert a legal malpractice action into a commodity; undermine the sanctity of the attorney-client relationship; result in decreasing the availability of legal services to insolvent clients; impact negatively on the duty of confidentiality and further the commercialization of malpractice claims that in turn would spawn an increase in unwarranted malpractice actions—we conclude that the assignment of a malpractice action to an adverse party in the underlying action creates a distortion that the profession cannot endure and thus should not tolerate.

The trial court in this case decided that the assignment of a malpractice action violated public policy. The trial court then, however, identified a distinction between an assignment of the underlying claim and an assignment of the proceeds from that claim. On the basis of that distinction, the court concluded that Connecticut's public policy does not prohibit the assignment of the proceeds, even when that policy would prohibit the assignment of the underlying action itself, and therefore the trial court concluded that Gurski's assignment of the proceeds to Lee was permissible.

In the present case, according to the compromise, Gurski agreed to assign to Lee the estate's interest in the malpractice claim. He further agreed to prosecute this action and to assign his recovery therein to Lee, up to the amount of the judgment she had obtained

against him, in exchange for her not executing the judgment. See footnote 4 of this opinion. Therefore, as a result of the compromise, Gurski had no personal obligation to Lee on that judgment and no financial interest in the action against the law firm. Id. Even if we were to assume, arguendo, that this assignment can be characterized as simply an assignment of proceeds, we disagree with the trial court's conclusion.

In support of this alternative argument, Gurski relies on: (1) *Berlinski* v. *Ovellette*, 164 Conn. 482, 489, 325 A.2d 239 (1973), overruled by *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 362, wherein this court recognized "a crucial distinction between an enforceable interest in the proceeds of an action and the right to maintain the action itself," and suggested that the former would not be barred; and (2) case law from other jurisdictions that recognize such a distinction in the tort context generally. Neither is persuasive.

In *Berlinski*, this court concluded that an equitable subrogation agreement was equivalent to an impermissible assignment of a personal injury action. Accordingly, we concluded that the agreement was barred, noting: "There is, of course, a crucial distinction between an enforceable interest in the proceeds of an action and the right to maintain the action itself. Once the insured has litigated a claim, the policy prohibiting the assignment of personal injury claims does not necessarily interfere with equitable subrogation and an equitable disposition of the proceeds. On this basis a New York court has upheld an insurer's recovery from the insured of a portion of the proceeds of his judgment where it held a trust receipt for an equitable lien on them, because the control of the action or the consummation of any settlement . . . [was] exclusively in the hands of the assignor. . . . We conclude that to the extent that the trust agreement in this case purports to transfer to [the assignee] the right to prosecute and

control at its own expense and by its choice of counsel the plaintiff's cause of action against the defendants for his personal injuries it is contrary to public policy and void unless the common-law public policy of the state has been changed by the General Assembly." (Citations omitted; internal quotation marks omitted.) Id., 489–90.

Gurski recognizes that the holding in *Berlinski* has been overruled by *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 374–75 ("equitable subrogation is not the equivalent of the assignment of a personal injury action, and . . . in the absence of that starting point, there is no logical support for the decision in *Berlinski*"). He nonetheless argues that two aspects of the decision survive: (1) the distinction between an assignment of a claim and an assignment of proceeds; and (2) the factor of control of the litigation as dispositive as to the validity of such assignments. We disagree. First, both points can be disposed of as dicta. Second, although control over the assigned malpractice action appears to be a relevant factor in some jurisdictions; see *Weiss* v. *Leatherberry*, supra, 863 So. 2d 371; *Tate* v. *Goins, Underkofler, Crawford & Langdon*, supra, 24 S.W.3d 633; it cannot be said that Gurski retained complete control. Here, Gurski was obligated to bring the malpractice action and, thus, did not have the right to withdraw the action. But see *Weston* v. *Dowty*, 163 Mich. App. 238, 241–43, 414 N.W.2d 165 (1987) (concluding that assignment of proceeds permissible when assignment required assignor to bring malpractice action within one year and conveyed to assignee all proceeds from action, less costs of bringing action).[13]

---

[13] The facts of *Weston* v. *Dowty*, supra, 163 Mich. App. 238, are similar to the present case. In *Weston*, a default judgment was entered against the plaintiff due to his attorney's failure to comply with discovery, the proceeds were assigned to the plaintiff's adversary in the underlying personal injury case, and the assignment both required the assignor to bring a malpractice action within one year and conveyed to the assignee all proceeds from the action, less costs. The Michigan Court of Appeals, in our view, applied a

Additionally, Gurski directs our attention to those jurisdictions that bar an assignment of a personal injury *tort* action but permit an assignment of the proceeds from such an action.[14] Those cases, however, are of minimal relevance here, however, because the rationale for the bar on assignments of tort actions generally does not implicate the policy concern specifically applicable to assignments to an adverse party in the underlying litigation. As we have underscored throughout this opinion, we have confined our decision in this case to the public policy concerns of an assignment solely in this specific context.

We note that only a handful of jurisdictions that bar assignment of a legal malpractice claim to the adverse party in the underlying litigation, either as a per se rule or under the particular facts of the case, have considered whether the proceeds of a legal malpractice

hypertechnical analysis that focused on the plaintiff's status as "the real party in interest" because he brought the suit in his own name without discussing the public policy implications: "Since [the] plaintiffs agreed to assign only a portion of their recovery, if any, from the malpractice suit, and since they did not specifically assign the claim or cause of action to [the assignee], we conclude that no assignment of a legal malpractice action occurred." Id., 242. The court noted as significant that the assignor, not the assignee, brought the action and stated: "[The] [p]laintiffs were the real part[ies] in interest although, under the terms of the consent judgment, [the assignee] obtained a beneficial interest in the lawsuit." Id., 243.

[14] See *Alabama Farm Bureau Mutual Casualty Ins. Co.* v. *Anderson*, 48 Ala. App. 172, 177, 263 So. 2d 149, cert. denied, 288 Ala. 538, 263 So. 2d 155 (1972); *Hernandez* v. *Suburban Hospital Assn.*, 572 A.2d 144, 147–48 (Md. 1990); *Edward J. Achrem Chartered* v. *Expressway Plaza Ltd. Partnership*, 112 Nev. 737, 740–41, 917 P.2d 447 (1996); *Constanzo* v. *Costanzo*, 248 N.J. Super. 116, 120–22, 590 A.2d 268 (1991); *Neilson Realty Corp.* v. *Motor Vehicle Accident Indemnity Corp.*, 47 Misc. 2d 260, 263–64, 262 N.Y.S.2d 652 (1965); *Charlotte-Mecklenburg Hospital Authority* v. *First of Georgia Ins. Co.*, 340 N.C. 88, 91, 455 S.E.2d 655 (1995); *In re Webb*, 187 B.R. 221, 227 n.8 (E.D. Tenn. 1995); but see *Mallory* v. *Hartsfield, Almand & Grisham, LLP*, 350 Ark. 304, 308–309, 86 S.W.3d 863 (2002) (barring assignment of proceeds of tort action); *Town & Country Bank of Springfield* v. *Country Mutual Ins. Co.*, 121 Ill. App. 3d 216, 218, 459 N.E.2d 639 (1984) (same); *Harvey* v. *Cleman*, 65 Wash. 2d 853, 858, 400 P.2d 87 (1965) (same).

can be assigned. Of those jurisdictions, two have barred the assignment, one has permitted the assignment and one has cases going both ways.[15] See *Botma* v. *Huser*, supra, 202 Ariz. 18 (barring assignment of proceeds to party in underlying litigation as legal equivalent to impermissible assignment of claim if contract made prior to settlement or judgment); *Weiss* v. *Leatherberry*, supra, 863 So. 2d 371 (barring assignment to party in underlying litigation as tantamount to impermissible assignment of claim, but leaving open possibility that assignment of proceeds permissible if assignee retains control over litigation); *Weston* v. *Dowty*, supra, 163 Mich. App. 241–43 (permitting assignment to party in underlying litigation, noting importance of fact that partial assignment was made and that assignor was real party in interest); *Tate* v. *Goins, Underkofler, Crawford & Langdon*, supra, 24 S.W.3d 633 (barring assignment to former adversary on policy grounds when assignor retained 10 percent of any net recovery and assignee given absolute control over litigation); *Baker* v. *Mallios*, 971 S.W.2d 581 (Tex. App. 1998) (permitting assignment because policy concerns court had cited in prior case not applicable when portion of proceeds was assigned to disinterested third party), aff'd, 11 S.W.3d 157 (Tex. 2000).

The Texas cases are particularly instructive in that the court expressly focused on whether the assignment

---

[15] Two other jurisdictions have permitted an assignment of proceeds from a legal malpractice action, but apparently have not considered the broader, and indeed more fundamental, question of whether assignment of such claims are barred nor the public policy considerations relied on in numerous other jurisdictions. See *Bonha* v. *Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745, 757–58 (Alaska 1992); *First National Bank of Clovis* v. *Diane, Inc.*, 698 P.2d 5, 9–10 (N.M. App. 1985). In neither of those jurisdictions, however, did the case involve an assignment to an adversary in the underlying litigation that would implicate a concern about inconsistent positions. Compare *Quality Chiropractic, P.C.* v. *Farmers Ins. Co. of Arizona*, 132 N.M. 518, 528–29, 51 P.3d 1172 (2002) (extensively discussing policy concerns in declining to recognize any distinction between assignment of personal injury claim and proceeds from such claims).

was made to the adversary in the underlying litigation giving rise to the malpractice claim as a principal rationale for its decisions. Compare *Tate* v. *Goins, Underkofler, Crawford & Langdon,* supra, 24 S.W.3d 633 (barring assignment of proceeds to former adversary, noting that facts were closely analogous to *Zuniga* v. *Groce, Locke & Hebdon,* supra, 878 S.W.2d 313, wherein court previously had barred assignment of legal malpractice claim to adversary in underlying action) with *Baker* v. *Mallios,* supra, 971 S.W.2d 585 (permitting assignment of proceeds to disinterested third party, noting that "most striking difference between this case and *Zuniga* is that there is not 'an illogical reversal of roles' ").

Finally, we agree with those courts that have identified the "meaningless distinction" between an assignment of a cause of action and an assignment of recovery from such an action, which distinction is made merely to circumvent the public policy barring assignments. *Town & Country Bank of Springfield* v. *Country Mutual Ins. Co.,* 121 Ill. App. 3d 216, 218, 459 N.E.2d 639 (1984). We will not engage in such a nullity.

The judgment is reversed and the case is remanded with direction to render judgment for the law firm.

In this opinion the other justices concurred.